**SO ORDERED.**

**SIGNED this 30 day of January, 2007.**



_____
**ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RUSSELL G. HELMERS, | ) | Case No. 06-11599 |
| KATHY J. HELMERS, | ) | Chapter 11 |
| | ) | |
| **Debtors.** | ) | |

## MEMORANDUM OPINION

This matter is before the Court on the United States Trustee's ("UST") motion pursuant to 11 U.S.C. § 1112(b) to convert this chapter 11 case to proceedings under chapter 7 for cause.[1] The Court conducted an evidentiary hearing on the motion on January 17, 2007. At the hearing, the

___

[1] This bankruptcy case was commenced on or after October 17, 2005. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective for most purposes on that date, therefore applies to this matter. Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, et seq. as amended and currently effective.

1

parties orally stipulated that cause exists,[2] but debtors opposed conversion to chapter 7, arguing instead that dismissal was appropriate. The UST is adamant that the best interests of the creditors and the estate require that the case be converted and not dismissed. Thus, the entire controversy at trial centered on those best interests. The UST appeared by David Eron. Debtors appeared in person and by their counsel, Mark J. Lazzo. No other parties in interest appeared.

Introduction

11 U.S.C. § 1112(b) provides that the Court shall, for cause shown, dismiss or convert a chapter 11 case "whichever is in the best interests of creditors and the estate."[3] Here, the debtors concede that they cannot propose a confirmable plan because they owe the Internal Revenue Service ("IRS") in excess of $978,000. Instead, they propose the case be dismissed so that they may pursue an offer in compromise with the IRS, an option not open to them while they remain in bankruptcy. The UST rejoins that certain prepetition conduct of the debtors suggests they may have other assets that are so far undisclosed. In addition, the UST alleges that the debtors have undervalued the real property in the estate such that after paying the IRS's claims, funds would remain for the unsecured creditors.

Findings of Fact

Debtors filed their case on August 29, 2006, apparently to halt a tax foreclosure sale being pursued in state court. Russell and Kathy Helmers operate a road construction business in Haysville,

---

[2] No written stipulation was offered. Nor did the parties specify which of the grounds for cause were established. *See* 11 U.S.C. § 1112(b)(4).

[3] Section 1112(b) was amended by BAPCPA but the amendments did not change the two alternatives – conversion or dismissal for cause. Nor did BAPCPA alter the "best interest of creditors and the estate" standard for determining which alternative should be chosen. Thus, previous case law on the best interests test remains good law.

2

Kansas. In addition, Kathy runs a bingo parlor located in the same town, a small suburb south of Wichita. The Helmers state that they own a residence in Haysville; a shop for their construction business on Grand Avenue; some frontage on South Broadway, a main thoroughfare in the area; and the bingo parlor, also located on Grand Avenue. In addition, they own a line of construction equipment and vehicles used in that business.

After this case was filed, the UST conducted a property title search, possibly on a tip from a creditor, and discovered that the Kansas Department of Revenue records showed the debtors owning a number of cars and trucks not disclosed on their schedules. Most of these vehicles were old, some possibly "classics," but no evidence of the vehicles' value was offered. In the course of the UST's investigation, Kathy Helmers provided bills of sale which documented the prepetition cash sales of these vehicles to various family members and friends. According to Kathy, she sold these vehicles as much as three years before this case was filed, but did not deliver titles to the buyers until after the petition date. Thus, the UST concluded, and argues here, that the debtors continued to own these vehicles and failed to list them. Kathy testified that she had to title these vehicles in her name in order to convey them to others and that she could not pay her vehicle taxes on the construction company's vehicles without doing so.[4] The UST also contends that the debtors have significantly undervalued their real property, relying on the testimony of Jonas Castleberry, the Helmers' insurance agent. Mr. Castleberry, who handled the Helmers' insurance needs, is also a licensed realtor and broker familiar with the real estate market in Haysville and south Wichita.

As noted above, the debtors owe upwards of $978,000 to the IRS. The IRS's amended proof

---

[4] No explanation was provided for Kathy's lengthy delay in procuring the vehicle titles - more than a year after the alleged sales.

of claim filed here shows a total claim of $1,383,078, consisting of a $214,495 secured claim, a $366,221 priority claim, and an $802,361 unsecured claim.[5] Attached to the proof of claim is a Notice of Federal Tax Lien ("NFTL") filed in November of 2004 to secure repayment of some $606,550, suggesting that, notwithstanding the limited extent of the Government's secured portion of its proof of claim, an additional substantial lien may exist and encumber the debtors' assets.[6] Other than that portion of the IRS's claim that is designated as unsecured, filed unsecured claims in this case total about $30,000 and the debtors have scheduled unsecured claims of $172,807, exclusive of the IRS's scheduled unsecured claim.

Much trial time was spent outlining the various car transactions. It is sufficient for today's purposes to note that nine vehicles are involved. They include a 1969 Pontiac LeMans, a 1967 Chevy El Camino, a 1936 Chevrolet Standard pickup, three Chevy Corvettes (1970, 1981, and 1986), a 2003 Pontiac Vibe, a 1995 Eagle Talon, and a 1968 Chevy. A car enthusiast's interest would doubtless be piqued by the old Pontiac and the Chevys. Six of the vehicles were sold to family and friends. The 1969 Pontiac and 1967 Chevy El Camino were sold to friend Joan Lough in 2004 for $4,300. The 1970 and 1981 Corvettes were sold to Alice and Kermit Hacker, Kathy's elderly parents, in 2004 for $3,500.[7] The 1986 Corvette was sold to Shawna Helmers, Kathy's

---

[5] Proof of Claim No. 6 filed October 18, 2006.

[6] *See* 26 U.S.C. § 6321 (Federal tax lien is a lien upon "all property and rights to property, whether real or personal" belonging to the taxpayer.); *Drye v. United States*, 528 U.S. 49 (1999) (Language of federal tax lien statute is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.); *United States v. Wingfield*, 822 F.2d 1466, 1472-73 (10th Cir. 1987); *United States v. Craft*, 535 U.S. 274 (2002). *See also* 26 U.S.C. §§ 6322-6323.

[7] Ex. D.

4

daughter, in 2003 for $3,500.[8] The 1936 Chevy was sold to Cleo Brown, a family friend, in 2000 for $1,500.[9]

Kathy testified that she sold the 1969 Pontiac and 1967 Chevy to her friend, Joan Lough in January of 2004 for a total of $4,300. She presented bills of sale that appear to have been notarized on January 20, 2004.[10] However, Kathy applied for and obtained titles to these cars on July 1, 2005 and maintained insurance for them.[11] She says she did that because she could not title her other vehicles without doing so. She says she did not deliver titles to Joan Lough at the time of sale because she did not have or could not locate them in 2004. After Kathy obtained titles to the vehicles, she assigned them to Lough on July 29, 2005.[12]

Suffice it to say that the other vehicle sales transactions followed a similar pattern and with slight variations, were of this nature. Each sale was a cash sale. Kathy indicated that she sold the vehicles because she needed money to pay bills. After the sales, the vehicles were kept at the Helmers' shop where the buyers were restoring or working on them to make them operable. Some titles to the sold vehicles were obtained in Kathy's name in July 2005, long after the bills of sale were executed. It is not apparent that Kathy executed the assignment on the reverse side of the titles or eventually delivered the titles to the buyers in each case. In any event, it is apparent, based upon title records from the State of Kansas that as of 2006, the buyers had not re-titled the vehicles in their

---

[8] Ex. C.

[9] Ex. E.

[10] Ex. A and Ex. GG.

[11] Ex. 7 and 9.

[12] Ex. B and Ex. M. Ms. Lough submitted an affidavit stating that she never re-titled the vehicles in her name. *See* Ex. GG.

5

name. Each buyer testified either in person or via deposition that the sales were for consideration, that Kathy could not provide titles at the time of the sales, that the sales were at arms-length, and that Kathy asked none of them to conceal or withhold information concerning the sales.

The 2003 Pontiac Vibe was titled in Kathy and her daughter Amanda. Amanda bought the vehicle in late 2002. Kathy co-signed the loan to enable Amanda to buy the car. Amanda made all of the car payments, paying it off in three years. At one point, the vehicle was pledged as collateral by Amanda and her boyfriend to borrow money and catch up on house payments.

The 1995 Eagle Talon was also titled in Kathy's and Amanda's names. Amanda purchased this car from family friend Joan Lough when she was 15 years old. Amanda made payments to Joan until Joan informed her at some point that the car was paid for and released it to her. Amanda testified that the car has been inoperable since at least 2002 when she bought the Vibe.

The 1968 Chevy was titled in Kathy and her son Jon. Jon purchased the car from a friend in 2000 and the day he bought the car (on his 19th birthday) he was arrested for driving on a suspended license and the car was impounded. Both Kathy and Jon testified that in order to get the car out of impound her name had to be on the title. Jon listed the car as an asset on a 2004 loan application. Jon testified that the Chevy is in his garage but no longer runs.

The Court cannot conclude from these transactions and the circumstances surrounding them that Kathy Helmers is dishonest or inclined to mislead. While Ms. Helmers' memory improved when she was being examined by her counsel, the Court cannot conclude that she so lacked credibility as to totally discount her testimony. Moreover, the Court has no reason whatever to doubt the credible testimony of her daughter Amanda, her son Jon, her brother Terry, and the deposition testimony of the other buyers that these sales were legitimate, albeit poorly or

6

insufficiently documented. Further, while the Court's suspicion was raised by the fact that several of these cars remained in the Helmers' possession at their shop, the evidence is that the Helmers are active car buffs with a large, well-equipped space to keep cars while they are being restored. Apparently several of these vehicles fell into that category and the Helmers stored them while the buyers worked on them.[13]

Had the debtors not conceded the existence of cause to convert or dismiss their case, the Court would more closely examine the details attending each and every one of these car sales and transactions.[14] As it is, however, the Court's main concern here is with determining whether the creditors' and estate's best interest will be served better by a conversion or a dismissal. Accordingly, the Court must focus on what the estate contains, what the creditors may reasonably expect to recover, and whether the UST has demonstrated a likelihood that there may be other unreported assets to be recovered.

According to the debtors' schedules as offered in evidence at the hearing, the debtors own several tracts of real property, some construction equipment, and several vehicles. The principal dispute about this property relates to the value of their nonresidential real estate. Their homestead is valued at $75,000, and is subject to a lien for unpaid ad valorem taxes of $13,367. Presumably the IRS's NFTL attaches to this property, too, rendering the debtors' interest in it valueless after

---

[13] Debtors did not disclose in their Statement of Financial Affairs any property owned by others that they were holding.

[14] In the same vein, Jonas Castleberry's testimony would take on added significance. He testified that he had a conversation with Kathy in August of 2006, at or near the time of the bankruptcy filing, wherein he admonished Kathy that all assets owned would have to be disclosed in the bankruptcy, including all vehicles for which Kathy was listed on the title. According to Castleberry, Kathy responded by stating, "I'll figure out something."

7

deduction of liens.

The debtors also own property at 5663 South Broadway that they value at $5,000. The UST called Jonas Castleberry, the debtors' insurance agent and a real estate broker, as a witness. Castleberry testified that he made numerous sales of real estate in the south Wichita - Haysville area and that the Broadway property is likely to bring $200,000 at sale.

The debtors also own property at 420 E. Grand in Haysville, valuing the same on their schedules at $90,000. Castleberry's "appraisal" of this property, without elaboration, is $250,000. Near the 420 Grand property is the debtors' tract at 432 E. Grand which they value at $85,000. This is the bingo hall. Castleberry values this property at $250,000, again without elaboration.

In so testifying, however, Castleberry supplied none of the usual support for his conclusions that a Court would expect an appraiser to provide. Castleberry supplied no comparative sales, no market analysis, and no testimony about how the property might be used. The Court admitted his testimony as an "expert," albeit without debtors' objection. Nevertheless, Castleberry's valuation testimony is less than persuasive due to the complete lack of supporting data or analysis.

The debtors scheduled their equipment at $48,650 and their vehicles at $34,800. Those vehicles did not include the debtors' respective exempt means of conveyance, a Ford F-150 pickup valued at $15,000 and a Chevy Tahoe valued at $14,500. Each of the exempt vehicles is subject to a lien in excess of its value. The Court presumes that the equipment and non-exempt vehicles are subject to the IRS's NFTL and would therefore have no value for unsecured creditors. Beyond the testimony of Mr. Castleberry, the UST provided no other valuation evidence of any kind.

With respect to the likelihood that the debtors have concealed or failed to report assets that would benefit the creditors or the estate, the only relevant evidence in the record is their conduct in

8

connection with the car sales.[15] While some of the sales were to insiders and not documented as one would have hoped, the Court cannot leap from those failings to a conclusion that the debtors have concealed other property. Indeed, the debtors amended their schedules when the UST brought this motion in December of 2006.[16] Although not discussed at trial, that amendment revealed the existence of a certificate of deposit of nearly $75,000 that was previously not disclosed. That CD secures a loan of like amount from Southwest National Bank to the debtors. In any event, the Court concludes that while debtors initial filings were not as accurate as they should have been, the UST has failed to demonstrate a basis for strong suspicion that there are other assets to be located and liquidated for the creditors' benefit.

Analysis

Section 1112(b) provides that once cause for relief is established, the Court has a choice between converting the case or dismissing the case – whichever "is in the best interests of creditors and the estate." The Court is given broad discretion in determining which choice to make but is governed by this "best interests" test.[17] The Code does not define the phrase or set forth what factors to consider in determining what is in the best interests of creditors and the estate. The UST's position is that the debtors' prepetition misconduct (i.e. nondisclosure of assets or fraudulent

---

[15] Even the debtors' nondisclosure of these 9 vehicles is somewhat understandable notwithstanding the titling discrepancies. The Court comprehends that if debtors had previously sold the vehicles as they contend, it was reasonable for debtors to conclude that they no longer owned the vehicles and therefore, not list them on their schedules, particularly given the lengthy lapse of time since the sales.

[16] Dkt. 50.

[17] *See In re Midland Marina, Inc.*, 259 B.R. 683, 686 (8th Cir. BAP 2001); *In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); *In re State Street Associates, L.P.*, 348 B.R. 627, 641 (Bankr. N.D.N.Y. 2006); *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001).

9

transfers) is a relevant factor to consider in applying the "best interests of creditors and the estate" standard. Debtors argue that the UST merely wants to keep this case open to investigate the presence of other assets or avoidance claims and that keeping the case open in chapter 7 will destroy the debtors' business, to the detriment of their creditors.

Collier's bankruptcy treatise sheds some light on this issue. Where the parties disagree on the conversion or dismissal alternatives, the court must determine which alternative is appropriate, considering the following factors:

> (1) whether some creditors received preferential payments, whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset,"; (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.[18]

While not all of these factors are applicable here, some of these factors can be evaluated under the evidence presented at the hearing.

Two cases of interest cited under the eighth factor are *In re Mobile Freezers, Inc.*[19] and *In*

---

[18] Alan N. Resnick and Henry J. Sommer (Co-Editors), 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[6] (15th ed. rev. 2005). *See also In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D. N.Y. 2001) (citing the factors listed in Collier's).

[19] 146 B.R. 1000 (S.D. Ala. 1992), *aff'd* 14 F.3d 57 (11th Cir. 1994).

10

*re Mazzacone.*[20] In *Mobile Freezers*, the Eleventh Circuit Court of Appeals affirmed the district court's reversal of the bankruptcy court's denial of a motion to convert, concluding that the bankruptcy court abused its discretion. The district court held that debtor's attempt to circumvent the priority provisions of chapter 7 by selling all of its assets (in contravention of its plan of reorganization) after its chapter 11 plan was confirmed warranted conversion of case. The district court concluded that a material breach of the chapter 11 plan supported conversion of the case to chapter 7. The court did not focus on the conversion-dismissal alternatives and the best interests of creditors test per se. Instead, the court emphasized the existence of cause for conversion.

In *Mazzacone*, the district court reversed the bankruptcy court's dismissal of debtor's chapter 11 case, finding an abuse of discretion because it failed to consider the alleged prejudice to creditor's interests of dismissal. Competing motions were filed under § 1112(b) by a creditor (who sought conversion to chapter 7) and the United States Trustee (who sought dismissal). The creditor contended that debtor had mismanaged the estate by transferring assets of the estate, making improper payments from the estate, and failing to maintain adequate financial records. The district court concluded that removing the debtor from the supervision of the bankruptcy court could lead to continued diminution of the estate and potential reduction in the portion of creditor's claims that would be satisfied. Unlike our case, the debtor had been in chapter 11 as a debtor in possession for some 13 months.

The case before the Court is different. The prepetition sales the UST complains of occurred, in some cases, three and six years before this case was opened. There is nothing in the record to suggest that the debtors' conduct, while not consistent with commercial practice, was intended to

---

[20] 180 B.R. 782 (E.D. Pa. 1995).

11

defeat the legitimate interests of creditors.  Instead, as debtor Kathy Helmers credibly testified, they were selling the vehicles to raise money and pay debts.

With respect to some of the other factors noted in Collier's treatise, we have very little evidence that would enable the Court to evaluate the debtors' conduct in their light.  What is of the moment here is comparing how the creditors would fare inside as opposed to outside bankruptcy.  What happens to the debtors is not really relevant.[21]

The Court therefore undertakes a liquidation analysis based on the evidence at hand.  The Court notes with great interest the complete absence of involvement in this motion by the IRS, the principal creditor in the case.  The Court suspects that this is because the IRS, holding a lien position of primacy (except with respect to some of the ad valorem taxes), will fare as well outside bankruptcy as within it.  For the purposes of this analysis, the Court will assume that the UST's attributed values to the real estate are in fact correct and that the IRS has a lien on all of the assets in the amount of $606,000, the amount shown on the NFTL attached to its proof of claim.  After applying the $75,000 value of the homestead (less ad valorem taxes of $13,367)[22] to that lien, the IRS would have a remaining deficiency of <$544,367>.  Assuming the Broadway property brought $200,000, after deducting ad valorem taxes ($2,450) and the IRS lien, the IRS would have a remaining deficiency of <$346,817>.  Liquidation of the 420 Grand property at $250,000, after deduction of ad valorem taxes of $63,818, would leave the IRS with a deficiency of <$160,635>.

---

[21] *See In re Continental Holdings, Inc.*, 170 B.R. 919, 927-28 (Bankr. N.D. Ohio 1994) (The court must make inquiry and compare creditors' interests in bankruptcy with those they would have under state law if the case were dismissed.).

[22] *See* 26 U.S.C. § 6323(b)(6) (federal tax lien does not take priority over real estate taxes).

After sale of the 432 Grand property for $250,000 and deduction of $61,097 in ad valorem taxes, the IRS lien would be satisfied and a surplus of only $28,268 would remain.

That amount, combined with the value of the equipment, $48,650, and vehicles, $34,800, would leave distributable assets for unsecured creditors of $111,718. According to the claims register, the IRS has a substantial priority tax claim of $366,221. In addition, the Kansas Department of Revenue has filed a priority claim in the amount of $34,727. In a chapter 7 case, after payment of administrative expenses, what remained of the $111,718 would be paid pro-rata to these two priority creditors, leaving nothing whatever for the benefit of the unsecured creditors.[23] Thus, even assuming the UST's real estate values are correct, the creditors would not benefit from a conversion of this case to chapter 7. Of course, if the values are as scheduled, the IRS would be left with a significant deficiency and unsecured priority or general claimants would receive nothing.

Therefore, the Court cannot conclude that the UST has borne its burden to prove that a conversion of this case would be in the best interests of the creditors and the estate. There is no reason to keep this case open and add another layer of administration onto it for the benefit of the IRS (or any other single creditor) when that creditor has not requested it. Had the IRS insisted on conversion, the Court might reach a different conclusion. But, in this case where the IRS is well-situated to preserve its rights inside or outside of bankruptcy, this Court declines to address scarce judicial and administrative resources to retaining this case in chapter 7, especially where there are

---

[23] In fairness, the Court ran another calculation using the IRS's secured claim amount of $214,495 instead of its lien amount and the trustee's imputed real estate values. In that scenario, the unsecured creditors would receive a 52 per cent dividend – some $115,734 would be left to distribute after payment of all secured and priority claims. The Court disregards this calculation because of the existence of the NFTL. The UST, holding the burden of proof, could have supplied evidence that would have greatly clarified the IRS's position and eliminated this Court's need to speculate.

13

no unencumbered liquid assets to initially fund a chapter 7 administration.

Accordingly, upon the parties' stipulation that cause exists, the Court concludes that the best interests of the creditors and the estate will be served by an ORDER DISMISSING the debtors' case as provided in § 1112(b). IT IS SO ORDERED.

# # #